# U.S. District Court
## Middle District of Florida
### 479
### Jacksonville Division

# GOVERNMENT EXHIBIT

## Exhibit No.:_____7_____

Case No.: 3:24-cr-187(S1)-WWB-LLL

UNITED STATES OF AMERICA

vs.

FREDERICK KARL HILDENBRAND

Date Identified: 1/14/26

Date Admitted: 1/14/26

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA          Case No. 3:24-cr-187-WWB-LLL

v.                                November 25, 2025

ERIN LYNN HILDENBRAND,            11:06 a.m. - 12:30 p.m.

        Defendant.                Courtroom 5D

COMPETENCY HEARING

BEFORE THE HONORABLE LAURA LOTHMAN LAMBERT
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S**

COUNSEL FOR THE GOVERNMENT:
**LAURA COFER TAYLOR, ESQUIRE**
United States Attorney's Office
300 North Hogan Street, Suite 700
Jacksonville, FL 32202


COUNSEL FOR THE DEFENDANT:
**JEREMY LASNETSKI, ESQUIRE**
Lasnetski & Gihon
121 West Forsyth Street, Suite 510
Jacksonville, FL 32202


OFFICIAL COURT REPORTER:
Katharine M. Healey, RPR, RMR, CRR, FPR-C
PO Box 56814
Jacksonville, FL 32241
(904) 301-6843
katharinehealey@bellsouth.net


                    (Proceedings reported by stenography;
                    transcript produced by computer.)

2

I N D E X

GOVERNMENT'S WITNESS:

**TIFFANY K. SMITH, Psy.D.**

DIRECT EXAMINATION BY MS. TAYLOR COFER............ PAGE 7

CROSS-EXAMINATION BY MR. LASNETSKI................ PAGE 30

REDIRECT EXAMINATION BY MS. TAYLOR COFER.......... PAGE 51

E X H I B I T S

RECEIVED IN EVIDENCE

GOVERNMENT'S EXHIBIT 1............................ PAGE 10

3

<u>P R O C E E D I N G S</u>

November 25, 2025                                    11:06 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session.  The Honorable Laura Lothman Lambert presiding.

Please be seated.

THE COURT:  Good morning, everyone.  We are here in the case of *United States of America vs. Hildenbrand,* Case No. 3:24-cr-187-WWB-LLL.

We have Ms. Taylor here on behalf of the government. Good morning, Ms. Taylor.

MS. TAYLOR:  Good morning, Your Honor.

THE COURT:  We have Mr. Lasnetski here on behalf of the defendant.  Good morning, Mr. Lasnetski.

MR. LASNETSKI:  Good morning, Your Honor.

THE COURT:  And this is your client, Ms. Hildenbrand, next to you, correct?

MR. LASNETSKI:  That is correct, Your Honor.

THE COURT:  Okay.  I'm going to try to turn off -- I know we have the expert here via Zoom.  I'm going to turn this off and see what happens.

All right.  Dr. Smith, can you hear me?

DR. SMITH:  Yes, I can.  Can you hear me okay?

THE COURT:  I can, yes.

4

DR. SMITH:  Great.

THE COURT:  We're just going to go ahead and go through some general kind of preliminary matters, so if you just want to mute yourself --

DR. SMITH:  Perfect.  Will do.

THE COURT:  -- until we're ready to hear from you.

DR. SMITH:  Thank you.

THE COURT:  Thank you.

Okay.  So we are here today, by way of background, previously Mr. Lasnetski had some concerns about his client's competency.  He retained an expert to assess her and give an opinion based on her competency.  The government also hired an expert.  The Court ordered Dr. Harris to give an opinion on Ms. Hildenbrand's competency as well.

We previously had a hearing on that matter.  And at the conclusion of the testimony of the two experts, it became clear to me that they were operating off of different subsets of information and their testimony was also very different.  And so what I did as a result of mainly the fact that they were not operating on the same record, directed Ms. Hildenbrand to go for an extended evaluation, which she did.

And the Court has received Dr. Smith's evaluation of Ms. Hildenbrand.

Ms. Taylor, have you received a copy of that evaluation?

5

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  All right.

And Mr. Lasnetski, have you received a copy of that evaluation?

MR. LASNETSKI:  I have, Your Honor.

THE COURT:  Okay.  So we are here today to decide whether by a preponderance of the evidence that Ms. Hildenbrand is presently suffering from a mental disease or defect that would render her mentally unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense.

Ms. Hildenbrand, at this hearing I will give you an opportunity to testify if that is your desire.  You will have the opportunity to present evidence, to have witnesses, and for your lawyer to cross-examine any witnesses presented by the government.

If after this hearing based on the evidence presented I find that you are incompetent to stand trial, then I have to commit you to the Attorney General's custody, who must hospitalize you in a suitable facility for such a reasonable time, not to exceed four months, as necessary to determine whether there is a substantial probability that in the foreseeable future you will attain the capacity to permit the proceedings to go forward, and for an additional reasonable period of time until your mental condition is so improved that

6

the trial may proceed, or the pending charges are disposed of according to law, whichever is earlier. So if I find that you are competent to proceed, then the case will continue to move forward.

Ms. Taylor, does the United States have evidence to present today?

MS. TAYLOR: Your Honor, the -- I'm calling Dr. Tiffany Smith -- try again. I'm calling Dr. Tiffany Smith with the Bureau of Prisons. And my only exhibit will be her report, which I provided a copy of to the courtroom deputy and to the defendant previously. And we'll just have to authenticate it I think by asking Dr. Smith some questions about it.

THE COURT: Okay.

MS. TAYLOR: Since we are via Zoom, I was wondering if it would be okay for me to be seated here while I ask questions?

THE COURT: Yes.

And you as well, Mr. Lasnetski. Just for the ease of the proceedings, I want to make sure that Dr. Smith can see you both and hear you both. So I appreciate the request. And you are both permitted to stay seated at counsel table while you examine the witness.

Okay. So I guess we'll start out with you calling Dr. Smith; is that correct, Ms. Taylor?

7

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  All right.

Madam Deputy, if you could please swear in Dr. Smith.

COURTROOM DEPUTY:  If you could please raise your right hand.  Do you solemnly swear or affirm that the answers you will give during these proceedings will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  All right, Dr. Smith.  Could you please state your name and spell it for the record, please.

THE WITNESS:  Yes.  Tiffany Smith.  T-i-f-f-a-n-y, S-m-i-t-h.

THE COURT:  You may proceed, Ms. Taylor.

MS. TAYLOR:  Yes, Your Honor.

**TIFFANY K. SMITH, Psy.D., GOVERNMENT WITNESS, SWORN,**

DIRECT EXAMINATION

BY MS. TAYLOR:

Q.    Dr. Smith, where do you work?

A.    I work with the Federal Bureau of Prisons at the Metropolitan Detention Center in Los Angeles.

Q.    How long have you worked for the Bureau of Prisons?

A.    In March it will be 18 years.

Q.    And what specifically is your role with the Bureau of Prisons currently?

A.    My role -- my title is as a forensic psychologist.  So my

8

main duties are to conduct the court-ordered psychological evaluations of federal defendants.

Q. And how long have you been doing that particular duty?

A. For almost 18 years in this capacity. I've had some state-level competency evaluation experience prior to this position.

Q. And so are you actually working within the prison typically?

A. Yes. So we are based in the prison. We're actually on the women's housing unit, our department is. And then individuals are sent from around the country to our institution, depending on the designation, and that's where we will conduct the evaluations of the individual. And then they return back to the district to continue with the proceedings.

Q. And do you have experience in particular with making determinations about malingering as well?

A. Yes, I do.

Q. And could you tell us what your educational and training background is that qualifies you to have this position that you have.

A. Yes. So I have a bachelor's in psychology, a bachelor's in sociology, and a criminology and corrections certificate through my undergraduate training. Then I have a master's in clinical psychology and a doctorate in clinical psychology. And during those -- that was kind of a continuation program, so

9

I obtained my master's in the process of obtaining by Psy.D., which is my doctorate in psychology. And through that program I specialized in -- pardon me -- forensic psychology, so just the general intersection of psychology and law, as well as families and children. So I have training on testing and assessing -- I was trained even on preschool intellectual assessments, and so my clinical training has involved working with pre-school age through geriatric individuals.

Q. And did you complete a forensic evaluation report at the direction of Judge Lambert?

A. Yes, I did.

Q. And did you provide that to chambers and to defense counsel and to me?

A. Yes, I did.

Q. And is the report related to Erin Lynn Hildenbrand?

A. Yes, it is.

Q. And looking -- do you have your report in front of you?

A. I do.

Q. And looking at the front page, does it have Ms. Hildenbrand's name at the top?

A. Yes, it does.

Q. And does it also have her register number, 35770-511?

A. Yes, it does.

Q. And on the last page of the report, is that your signature?

10

A.    Yes, it is.

Q.    And that's page 22, correct?

A.    That's correct.

MS. TAYLOR:  Your Honor, at this time I'd move for the admission of Dr. Smith's report.

THE COURT:  Mr. Lasnetski, any objection?

MR. LASNETSKI:  No objection, Your Honor.

THE COURT:  All right.  That is granted, Ms. Taylor.

(Government's Exhibit 1 was admitted in evidence.)

BY MS. TAYLOR:

Q.    Can you just briefly describe what specifically -- or what you understood the situation or the procedural background to be in this case and what your task was in completing this evaluation and report.

A.    Yes.  So when we receive individuals designated to our institution, they can -- those referrals for, we'll stick with competency orders, can occur around indictment all the way up through sentencing.  So there's different aspects that are available at those different times.  So sometimes I have reports from previous evaluators, maybe even historically, and sometimes this might be the first time that they're being seen by an individual.

So in Ms. Hildenbrand's case, as the judge has outlined prior to my testimony, she was evaluated by a psychologist at the behest of her attorney, and then there was

a court-ordered psychological evaluation that occurred.  There was some discrepancy in the opinions and the basis of data that they utilized to formulate those opinions, and so then Ms. Hildenbrand was ordered for another competency evaluation, which is how she ended up with me.

And so I was -- had the opportunity to review the discovery materials, the medical records, the mental health records, the school records, the previous reports.  All of that's detailed in my report on pages 2 and 3.

And so I -- it was my understanding that I was to take the combined data sources from Dr. Wilmoth and Dr. Harris and utilize those as my data source to then conduct my evaluation of Ms. Hildenbrand for the Court.

Q.   And to be fair, and with no critique on Dr. Harris and Dr. Wilmoth, but your evaluation of Ms. Hildenbrand was more in-depth than the evaluations that they performed; is that your understanding?

A.   Yes.  I actually have the luxury of having individuals for a much longer period of time than evaluators who are coming in from the community, whether court ordered or retained.  So I have more access, and I have them at my facility for a period of time to observe and interact with them.

Q.   What sorts of -- what sorts of things do you consider as resources when somebody is in Ms. Hildenbrand's situation, where she's been ordered to the BOP for a period of time for a

12

more in-depth evaluation?  Is it just your interactions with her or are there other things that you consider as well?

A.   Oh, there's definitely other things that I consider, and as I mentioned, I definitely have the luxury with this setting and situation.

So I have direct observation of the individuals with the women that I evaluate.  I even have more direct observation, because I can just step outside of my door and see the housing unit and see the women held on the housing unit. With the men, I'll just need to go to their housing unit to observe them.

I have regular consultation with the custody officers, with the other staff that have interactions with the individuals.

They get a medical assessment while they're here, so I have access to those records, as well as consultation with the medical staff.

I have their monitored phone calls and emails that they send from the institution.  I have any testing that I administer, any interviews that I conduct.

And I consult with -- or have collateral contacts with both defense counsel and prosecution, as well as review discovery materials, maybe PACER documents, such as like the indictment, criminal complaints, as well as any medical or mental health records or education records or like Social

Security or VA type of stuff that is provided to me for review.

Q.    And did you look at all of those items with regard to Ms. Hildenbrand?

A.    Yes.  I mean, she didn't have the Social Security or VA record; that's just a generalization.  But in regards to like educational and historical records and investigative records, I did review those for Ms. Hildenbrand.

Q.    Did you feel -- or is it -- in your opinion, were the materials -- the background materials that you received on Ms. Hildenbrand sufficient?

A.    Yes.

Q.    And you also reviewed the reports from Dr. Wilmoth and Dr. Harris, correct?

A.    It was a little choppy.  I didn't hear your question. Could you please repeat it?

Q.    You reviewed the reports prepared by Dr. Harris and Dr. Wilmoth regarding Ms. Hildenbrand, correct?

A.    That's correct.

Q.    All right.  So I want to ask you --

THE COURT:  Ms. Taylor, did you want to -- I don't think we've recognized her as an expert.  Is that something that you wanted to do?

MS. TAYLOR:  Sure, Your Honor.  I'll tender her as an expert --

THE COURT:  For the record, do you want to, you know,

14

move that she should be an expert in specifically a certain area?

MS. TAYLOR:  I will tender her as an expert in the field of forensic psychology, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Lasnetski, any objections?

MR. LASNETSKI:  I have no objection, Your Honor.

THE COURT:  Okay.  Thank you.  You may proceed.

BY MS. TAYLOR:

Q.    Did you -- how did you go about deciding what inventories and other techniques to use to evaluate Ms. Hildenbrand?

A.    So I -- my standard is I'll do clinically focused background interviews as well as legally focused interviews. That's kind of across the board.  And then each individual, it depends on the presenting problem or the presenting concern.

So with Ms. Hildenbrand, she had indicated to me initially that she had a history of learning disabilities and special education and had difficulty with reading, and so that was something that I took into account.

She had just recently had intellectual testing administered by Dr. Wilmoth.  So I wasn't able to do the standard administration of a WAIS, a Wechsler Adult Intelligence Scale, that I typically would do with an individual with that type of history, but I could reference Dr. Wilmoth's scores from that testing.

15

I provided Ms. Hildenbrand with a Minnesota Multiphasic Personality Inventory, Third Edition, or MMPI-3. And that is a -- you know, like a bubble test, right.  So the participant reviews the question, answers true or false to items.  And that helps us get an understanding of their psychological functioning as well as some validity scales in there also.

And then based off of her presentation and some discrepancies that were noted, I also administered some symptom and performance validity measures to assess her investment in the testing and evaluation process.

Q.   And is that a fancy way of saying that you were testing to see whether she was malingering or not?

A.   Yes and no.  So it's not solely just for malingering because someone can get scores on the performance validity particularly, those tests, if there's just a lack of investment.  So if you kind of just think of a stereotypical teenager who's being forced to do something that they don't want to do and they might just be halfheartedly invested in the process, you could get similar scores from someone like that also.  So it's not necessarily malingering, per se, but it's indicating that there was not full effort put forth to that measure.  So that would be for the symptom validity one. That -- the b Test that I administered to Ms. Hildenbrand could have scores indicating suspect effort for someone who is just

16

not invested or someone who's intentionally attempting to appear more impaired than they are.

Q.    And you mentioned -- sorry, go ahead.

A.    No, go ahead.

Q.    You mentioned that you couldn't perform intellectual testing.  And why was that?

A.    So with the WAIS, which is the standard -- kind of gold standard that we use for measuring intellectual functioning, we need to have a period of at least 12 months between administration of those protocols in order to not have falsely elevated scores due to practice effects because they've been recently exposed to the stimuli.

So there are alternative methods that could be used to measure intelligence if my go-to has recently been used. However, given Ms. Hildenbrand's responses and performance on measures indicating suspect effort and potential exaggeration, I did not go through and do an additional test of intellectual functioning because based off of the other measures that showed invalid effort, the scores would likely not be valid on the testing, her intellectual testing, and it would negate the ability for any future evaluators to provide that test within the time period.

So say Ms. Hildenbrand is fully actively engaged in testing.  If I'd already given it, they couldn't give it.  So that left it open for future evaluators to use more -- sooner,

but also, it would have just told me that these are scores that are not consistent with her presentation and, you know, likely not an accurate measure of her true functioning.  So that's why I chose not to do it.

Q.    Did you make any accommodations in the way you administered your tests based upon what you knew about Ms. Hildenbrand?

A.    Yes.  With the MMPI-3, there is a standard audio administration.  So it is an audio CD from the test publisher that can be used for individuals that might have some reading difficulties or need to -- will respond better to audio.

And so she follows along -- the individual follows along with the printed test materials, has their bubble sheet answer sheet, and listens to the audio.  They have the opportunity to pause it.  The questions are repeated at least twice.  And so then they go through and listen to it, follow along, and put their answer down.

So I used that with Ms. Hildenbrand since she had indicated difficulty with reading and had asked me to read the court order to her.

So that's standard administration, but it might not be the typical administration because there's two standards. There's one where you just present them with the testing stimuli and then the other one where you have the audio version of it, which are both standard.

And then in regards to the SIMS, that's another test where the individual reads the item and then responds true or false to it.  With that one there's not a standardized audio administration for it, so I read the questions to Ms. Hildenbrand as she followed along and then she marked her responses to those questions.

Q.   And briefly, could you just tell the Court, what are you looking for -- what's necessary for a person to be competent?

A.    So in regards to 18, U.S.C., Section 4241, the first component that I'm looking for is, you know, the legal term of mental disease or defect.  So I'm looking for a major mental illness or some cognitive deficits, either intellectual functioning or if they've had cognitive impairment, like a stroke or other neurocognitive issues, that could then impact their ability to understand the charges, understand the potential consequences, understand the court proceedings, the expectations of the roles of the individuals in the courtroom, including their own role and participation, as well as their ability to consult with their attorney and to work with their attorney to determine the best course of action in their case. And so those are factors that I look at when I'm assessing an individual's competency to proceed.

Q.    Does Ms. Hildenbrand's apparent -- was it apparent to you in evaluating her that she does have some degree of learning disability or intellectual variance?

19

A.    Yes, it does.

Q.    And does that automatically equal incompetence?

A.    No, it does not.

Q.    Can you go into some detail about your testing results and what they told you?

A.    Yes, I can.  So with the MMPI-3, which was the first measure that I administered to Ms. Hildenbrand, she, you know, completed it within expected time frames through the standard administration.

Her -- as I indicated before, there's some validity scales in that test, and that showed that she understood the questions, she answered consistently throughout the administration of the test, but it also indicated that she denied some common, like, defaults that someone might.

So if there's an example of "I read the newspaper editorials every day" -- so that might have been removed since people don't read newspapers much anymore.  But that is one where if someone answered true to that, that would be one of the components we would look at:  Okay, they're trying to present themselves as better than they are and in a better light than they are.

And also, she answered questions in a manner of exaggeration or over-endorsement of symptomology and deficits.

Q.    And when that --

A.    Not to --

20

Q.    Sorry, go ahead.

A.    It wasn't to the extent to negate the testing to make it invalid, but it was to the level of -- interpretation guidelines say to interpret the scores with caution because they might be falsely elevated.

Q.    And so anything -- anything else that you want to say about the MMPI results?

A.    No.

Q.    What about -- you have noted that Dr. Wilmoth had administered a test called the M-FAST, correct?

A.    That was what was relayed to me through my collateral contact with the previous AUSA on the case.

Q.    And what is the M-FAST?

A.    So that one is a test that assesses an individual's responses to endorsement of psychotic symptoms or psychotic related symptoms.  And it is a test that is a screener for malingering.  So if someone reaches a certain threshold on that, you can suspect that they are malingering or falsely endorsing psychotic symptoms.  And then you would want to look into that further to see if they are, in fact, malingering.

Q.    And is that a test that you would have selected for Ms. Hildenbrand?

A.    In Ms. Hildenbrand's case I didn't have any indication that she was reporting or experiencing psychotic symptoms.  She didn't endorse those to me.  And I didn't see that in the

21

record.  So since the M-Fast solely measures for psychotic processes, I did not choose to administer that test.

Q.   And so in other words, that test is testing for psychotic symptoms, which wasn't what you were -- what you were looking for?

A.   That's correct.

Q.   And can you talk a little bit about the CAST -- you administered the CAST*ID test; is that correct?

A.   Yes, that's correct.  So that is a competency assessment measure designed for individuals with intellectual disabilities.  And so with some of the legally focused questions that forensic examiners may do, they'll often rely on open-ended questions and answers to assess the individual's knowledge and understanding of the court process.  Sometimes individuals with intellectual disabilities and/or lack of exposure to the court process might not be able to independently generate those responses.  So the CAST*ID relies on multiple choice responses for 40 of the 50 items.  And it presents a question and what -- three possible options.

Q.   And were you aware that Dr. Wilmoth had previously administered an equivalent test, the CAST*MR, to Ms. Hildenbrand?

A.   Yes.

Q.   And is there a difference between the CAST*ID and the CAST*MR?

22

A.    Just updated labeling and terminology to be consistent with diagnoses of intellectual disability as to opposed mental retardation.

Q.    But the substance of the test is the same?

A.    That's correct.

Q.    What -- was there anything of note between the previous application -- or administration of the CAST*MR and the results on the CAST*ID that you administered?

A.    Yes.

Q.    Can you please talk about that?

A.    Yes.  With Dr. Wilmoth, Ms. Hildenbrand performed better on the Basic Legal Concepts section than she did during the administration that I provided to her.

Q.    And what's the significance of that to you?

A.    So similar to potential practice effects from the WAIS, so being exposed to the material, there weren't any practice effects noted on the CAST*ID with Ms. Hildenbrand.  By that I mean I would expect with having had some more exposure to the information she would respond similarly to the items that she did with Dr. Wilmoth.  But she only answered 1 out of 25 correct when I administered that to her; whereas it was approximately 8 that she answered correct with Dr. Wilmoth.  And so that led me to be a little suspicious about that response pattern.

Q.    And that's a multiple choice test?

A.    Yes, it is.

Q.    And how many choices are there on the multiple choice questions?

A.    There's three.

Q.    And did -- according to Dr. Wilmoth's report, does she answer approximately 33 percent correct --

A.    Yes.

Q.    -- in the earlier administration?

A.    I believe so.  That sounds about right.  I would have to reference my notes on that.

Q.    And you said it was -- it's 25 questions?

A.    That's correct.

Q.    And when you administered the test, she got 1 correct?

A.    That's correct.

Q.    What does that suggest to you?  Or what do you conclude from that?

A.    So that led me to suspect that she likely knew the correct answer to knowingly select the wrong answer, because just by pure guessing, statistically she should have gotten a higher score than that.

Q.    Did you do any analysis of what the chances would be just by -- if she was selecting answers by random chance, what the likelihood would be that she would miss 24 out of 25?

A.    Yeah, I had done a calculation, I don't have those notes in front of me, but it was a lot of zeros after the decimal

24

point before it got to like 8 --

Q. So an extremely small chance of that being a random occurrence?

A. Extremely small chance.

Q. And you stated she should have shown some improvement from the first administration of the test, correct?

A. I would have expected her to have performed similarly to the way she performed with Dr. Wilmoth. So maybe not exactly the same, but within range of that.

Q. The test -- the -- this CAST*ID or CAST*MR test, it's a test to determine the defendant's sort of understanding of the legal process in their criminal case, correct?

A. Yes. It has the three separate sections. So that first section that we've been talking about is Basic Legal Concepts. So, "The role of the judge is to: A, B, or C?" Those types of things.

And then the second section is Skills to Assist Defense. And so hypothetical scenarios are presented with three possible choices.

And then the final section is the Understanding Case Events. And those questions are -- it's 10 questions, and those are open-ended questions about the alleged offense and the arrest and information of that sort.

Q. Is it -- if somebody comes in for an evaluation just really not knowing anything about how a criminal case works, is

25

it sometimes possible to educate them, including through the CAST*ID test, and sort of walking them through the correct answer?

A.    Yes.  So when I do that, I administer the test as standardized.  So I just go through it without any prompts or assistance on it and do it the way it's designed to be administered.  And then after the fact, then we can go back and discuss why they chose the answer that they chose and really ask them, "Okay.  Of these three answers, is that the best one?"  And, "Why did you choose that?"  And help educate them on the process.

Q.    And did you do that with Ms. Hildenbrand?

A.    Yes, I did.

Q.    And did you assess her understanding of the court process after having walked -- talked through the answers with her as well?

A.    Yes, I did.

Q.    And was she able -- did she appear to have been able to recall and retain information that she was taught when you went through that with her?

A.    Yes.

Q.    How did she score after the education?

A.    Well, I didn't, like -- I didn't want to give like an official score because I didn't do standard administration of it.  But I utilized the CAST*MR and I was engaged with

discussion of her; I would answer her questions; I, again, encouraged her to respond.  But she performed significantly better on the Basic Legal Concepts section and the Skills to Assist Defense section.

Q.    Did you give another inventory to assess in this area?

A.    So there is a measure called the Inventory of Legal Knowledge.  And that does not assess for competency per se, but that assesses the individual's effort in legally focused information.  So it's kind of a performance validity for -- specifically for competency.

Q.    And what did you learn from the administration of the ILK?

A.    So she performed in a manner which indicated suspect malingering.

Q.    What other inventories did you -- well, I guess I'm just going to ask an open-ended question, which is for you to tell us what else you observed about her in your testing and during the entire evaluation period that was informative as to her competency to stand trial.

A.    Yes.  So Ms. Hildenbrand had reported difficulties with memory, but there were inconsistencies in that in that she was able to be an adequate historian on multiple aspects of things. So there were some inconsistencies on what she was claiming were memory impairments versus what I was observing during our interactions.  And so I administered a test to assess her level of whether she was exaggerating memory impairment or not.  And

the results indicated that she was exaggerating memory impairment on that test.

And with the discrepancies noted through my observations and interactions with her as well as the testing with the MMPI, I also gave her a SIMS, which is a symptom malingering or effort test. So that one is one where -- like the M-FAST is specific to psychotic symptoms. The SIMS covers psychotic, neurologic, mood, intellectual impairment, those types of things, so it's a little bit more broad. And she evidenced exaggerated responses on that test as well.

Q. When you say she was able to be an accurate historian in some circumstances, can you give an example?

A. So she was able to relate information about her educational background and difficulties with school that was overall consistent with the records.

Similarly, talking about, you know, kind of her account of situations was consistent with documentation.

She knew the name of her attorney. She often referenced "Jeremy." And so he, I'm assuming, is a newer introduction into her life. Probably she met him at the time that he was assigned her case. So that shows that she was able to retain that information, as opposed to maybe like her mother's name, things of that sort, that would be more ingrained.

And she also referenced information that was

28

discussed during our previous sessions in subsequent sessions, so indicating that she retained information that we discussed in previous situations.

So I didn't find any problems with memory impairment from working with her.

Q.    Okay.  I want to move now to your conclusions.  And could you tell us what those are?

A.    Yes.  So I noted that Ms. Hildenbrand likely has some sort of intellectual disability, likely mild based off of historical test results and level of functional impairment as indicated from observations in historical records.

And also, she was not putting forth full effort on measures during the evaluation period.

She also has very limited exposure to the legal system.  So there were concepts and aspects about the court process that she just had never been exposed to so she didn't know that information.  But yet when we were able to talk about it, she asked meaningful questions, asking for clarification, and seemed to understand the information.  She was able to retain information as indicated by her comments of, "Well, you told me last time that it would be this."  So she might have not initially known some of that legal knowledge, but she demonstrated the ability to obtain it and to meaningfully use the information.

Q.    And do you believe that Ms. Hildenbrand would be able to

29

properly assist in her defense?

A.    I do.

Q.    And you believe that she's able to understand the nature and consequences of the proceedings against her?

A.    I do.

Q.    Ultimately, your conclusion is that Ms. Hildenbrand is feigning her symptoms; is that correct?  Or feigning incompetency?

A.    I think that she is not answering to her true ability and knowledge of the process.

Q.    Given that your testing indicated that she was not putting adequate effort, and maybe was deliberately trying to score poorly on your testing, I just want to ask:  Is there any chance that she is actually incompetent and that was somehow concealed by the malingering?

A.    Actually, it would be the reverse.  So the fact that I was able to get as much meaningful information from Ms. Hildenbrand, despite her lack of effort and/or feigning, indicates that the basis of my opinion about her ability is probably higher than what I rated it as.

Q.    Anything else that I didn't ask you about that you think would be highly pertinent for the Court to hear?

A.    Not that I can think of.

        MS. TAYLOR:  I have no further questions.

        THE COURT:  Thank you, Ms. Taylor.

Mr. Lasnetski, do you have cross?

MR. LASNETSKI:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LASNETSKI:

Q.    Good morning, Doctor.

A.    Good morning.

Q.    I wanted to talk a little bit about the CAST*ID test.  So your opinion is that Ms. Hildenbrand was intentionally getting questions incorrect to appear more intellectually disabled, correct?

A.    Not necessarily on --

Q.    And that's a general question, not just for that test.

A.    I wouldn't necessarily say that it was to appear more intellectually disabled, but to appear to have not as much legal knowledge and ability.  Does that make sense, the difference between the intellectual impairment and the legal knowledge?  Like I -- while I don't think she put forth full effort on, like, intellectual measures, I think the feigning is in regards to the legal knowledge and understanding versus a clear exaggeration of intellectual functioning.

Q.    Okay.

A.    It's a little nuanced, but that's how I would --

Q.    So in relation to the CAST*ID test, she scored much lower on one of the sections when it comes to the basic legal knowledge as compared to when she did that same test with

31

Dr. Wilmoth, correct?

A.    That's correct.

Q.    Okay.  But for two of those sections she actually scored better than she did with Dr. Wilmoth?

A.    I believe so.  Again, I would have to have Dr. Wilmoth's report right up here to compare them, but I believe so, yes.

Q.    And I think that's listed in your report as well.

A.    I believe so, yes.

Q.    And I think it's around page 18, paragraph 3.

A.    Okay.  Let me see here.

Q.    Actually, I think it's a little bit before that.  I'm jumping ahead.

A.    Yeah, I mean, I know I discussed it.  I was just looking at the exact scores here, so . . .

        Let me see.  So yes, she performed better on the other two sections.

Q.    So out of two of the three testing sections for the basic legal terms, she scored better when you gave her the test than previously when Dr. Wilmoth did?

A.    Yes.

Q.    And you actually administered the CAST*ID twice a few days apart; is that correct?

A.    Right.  I did the standard administration and then I went back and went over the first two sections in a more, like, educational -- in psychology we call it testing-the-limits

approach of kind of seeing outside of standard administration what their ability is to appropriate- -- like correctly respond to questions.

Q.    Okay.  And on that second administration, Ms. Hildenbrand scored significantly better on the basic legal concepts than she did the first time with you, correct?

A.    That's correct.

Q.    Okay.  So that indicates that she was trying on that second effort, correct?

A.    Yes.  Yes.

Q.    And then you talked about the Inventory of Legal Knowledge.  That's the ILK.  And that's designed to measure a person's response style or their effort, correct?

A.    That's correct.

Q.    Okay.  And she -- Ms. Hildenbrand scored lower than one percent of people who took the test?

A.    That's correct.

Q.    And in your report you indicate that 52 percent of adults who were malingering earn scores similar to Ms. Hildenbrand's?

A.    Yes.

Q.    And I'm just wondering about that terminology, "who were malingering," because, you know, this isn't a -- like a physical science.  So when you say 52 percent of adults who were malingering, that's 52 percent of adults who a professional gave an opinion that they were malingering,

correct?

A.    So that's based off the test developer's norms.   So there's comparison groups.   So the norm score individuals found not competent to proceed; individuals found competent; and -- I mean, there's a number of them to compare her to.   And then there's ones where for individuals that were found to be malingering and/or individuals -- because some of the norm groups include people who are instructed to feign too.

So there's people who a professional might have deemed to be malingering and then there's others who were told to feign during the administration to get test scores to utilize in developing the norms.

Q.    Okay.   And so all that data is mixed in together, the opinions of individuals that are malingering and then those that are told to feign and to malinger on purpose, correct?

A.    Correct.

Q.    Okay.   So like I said, this isn't a physical science. We're dealing with statistics here and probabilities and things of that nature?

A.    That's correct.

Q.    You also relied on some investigative phone calls that were made to Mr. Hildenbrand where Ms. Hildenbrand was also present and made some statements I think in the background; is that correct?

A.    That's correct.

34

Q.    Okay.    And you used those phone calls in your analysis on whether Ms. Hildenbrand was malingering, correct?

A.    I used those phone calls as a component to like assess her overall approach to things and diagnostically, yes.

Q.    And your opinion was that she seemed to understand things and was operating at a higher intellectual ability than your testing indicated; is that correct?

A.    And that presumption is based off of not solely those phone calls, but also the monitored phone calls that she had made while at the MDC, as well as --

Q.    We'll get to those --

A.    -- her interactions.

Q.    We'll get to those too.    I just wanted to focus on the investigative phone calls first.

A.    It was a component.    It wasn't solely based on the phone calls.

Q.    Sure.    Sure.

Okay.    And during those phone calls, it was mostly Mr. Hildenbrand that was speaking; is that true?

A.    That's correct.

Q.    And was there any discussion of legal terminology during those phone calls?

A.    Not that I recall, no, sir.

Q.    They're talking about a storage unit I think, correct?

A.    Yes.

35

Q.    So it wasn't really a great opportunity for you to listen to Ms. Hildenbrand discuss any issue of complexity.  Would that be fair to say?

A.    Yes.

Q.    You also reviewed Ms. Hildenbrand's interview with detectives?

A.    Yes.

Q.    And one of the statements that she made that you relied on, in part, was that she asked the detectives whether there was any way she could get out of this, indicating she knew that she was in trouble and she wanted to get out of trouble.  Is that true?

A.    Yes.

Q.    Okay.  But that's a pretty simplistic question, isn't it?  I mean, any minor child that gets caught with their hand in the cookie jar or has a parent that has an accusatory face is going to have that reaction.  Wouldn't that be true?

A.    That could be true, yes.

Q.    So that doesn't really indicate whether somebody is competent or understands the nature of significant charges against them, does it?

A.    I wouldn't say that it doesn't, but I wouldn't base an opinion that it does solely on that information.

Q.    Okay.  And you also reviewed the phone calls between Ms. Hildenbrand and her parents that were recorded while she

36

was at the facility, true?

A.    That's correct.

Q.    And during those phone calls, did Ms. Hildenbrand and her parents discuss complicated legal issues?

A.    Not -- I wouldn't say -- no, I would say they did not.

Q.    Were the -- were their conversations pretty basic, using simple terminology?

A.    There were conversations about the evaluation process and more general conversations that an individual might have socially.

Q.    Okay.  And you say the -- there were conversations about the evaluation process.  That's not a term that Ms. Hildenbrand would ever use, was it, "evaluation process"?

A.    She said, "I'm here for a psych, like you and Daddy had to do at" -- when they were doing the custody evaluations --

Q.    So she --

A.    -- or custody hearings for her children.

Q.    Okay.  So she shortened the word "psychological evaluation" to "psych"?

A.    Well, she said it was for "a psych eval for me," and then with her parents she specifically said "a psychological."  She didn't use the term "evaluation," she just said "for a psychological."

Q.    Okay.  And had you been using that term with her during that time period?

37

A.    In the informed -- like forensic identification section, I review the court order with the individuals and then I break down the legalese a little bit, because sometimes they can be difficult for people to understand some of it, and I really break down what the Court is asking for, and that they're asking for a court-ordered psychological evaluation, and then I break it down into the components of it.

So that is a term that I use, but I don't necessarily use it beyond kind of our initial interactions when I'm introducing the process.

Q.    All right.  So in your evaluation you also talk about a physical altercation where Ms. Hildenbrand says that she was -- she was accosted, physically assaulted, by somebody on September 12th.

A.    Was that -- was that the one with her cellmate, or that was another one?  Because there was two situations.

Q.    I believe it is.  My question really relates to a mental health evaluation that occurred during that review, I guess.

A.    Yes.

Q.    Okay.  And in your report you stated that Ms. Hildenbrand experienced cognitive deficits consistent with a reported history of special education.  What did you mean by that sentence?

A.    So what I mean by that is that she has a documented history of special education and some learning disabilities,

intellectual impairment.  And she appeared to be experiencing some cognitive deficits during my evaluation with her and then during that specific encounter.

Q.   So what specifically?  What were the cognitive deficits?

A.    So the way those mental health evaluations work for the disciplinary sanctions are like a micro competency/responsibility evaluation for the local disciplinary process.  And so by noting that, it was to let the individuals who are doing the hearing for the disciplinary sanctions know that she has a documented history of intellectual disabilities, and so that they should be cognizant of that and be sure to make sure she understands and answer any questions that she might have, versus proceeding as if someone is, you know, familiar with the process and doesn't have any diff- -- potential difficulty of understanding.

So it wasn't a specific deficit per se; it was the potential for maybe needing additional explanation for having questions answered.

Q.   Okay.  I want to talk about Ms. Hildenbrand's IQ for a minute.  So she was diagnosed with a severe learning disability in the second grade, correct?

A.   Yes.

Q.   Okay.  And she was placed in special education classes for all of the core classes:  reading, spelling, English, handwriting, and math classes?

A.    Yes.

Q.    And the only classes that she stayed in regular classes for was PE, art, and music?

A.    That's correct.

Q.    And she remained in special education classes throughout her elementary, middle, and high school schooling?

A.    Yes.

Q.    She had her first IQ test at the age of 7?

A.    I believe so.  It was young.  It was around that time that she was placed in special education.  So second grade, 7 years old, makes sense, yes.

Q.    And they determined that her full-scale IQ was an 85; is that correct?

A.    Yes.  I would have to look at my notes on that, but that sounds correct.

Q.    And is there any way to kind of equate that to a physical age of what a common IQ is for, you know, a child or adult or whoever?

A.    No, because with the IQ scores, it's not based off of an age, because IQ scores tend to remain stable over time.  So if someone scores 85 in the second grade, they should score within the range of that in seventh grade and in high school and twelfth grade and as an adult, too, unless there has been some sort of situation that included like some sort of brain damage or head injury, some event that may have impacted their

40

intellectual functioning.  So you would typically see IQ scores stable over time.

When you get age equivalents, what you're looking at is like academic functioning.  So measures of their reading or math skills, those can give a standard score as well as an age and grade equivalent.  So IQ scores wouldn't have an age equivalent per se, because a 90-year-old can have a full-scale IQ of 85 as well as a 7-year-old.

Q.   Okay.  So do you know what the academic equivalence would be for Ms. Hildenbrand?

A.   I know that it showed that she was functioning below grade and age level in her academics.  I don't have those specifics in front of me, but in her educational records there was that indication which led to the diagnosis of her learning disability, because they measured her intellectual functioning, which was in the average-to-low-average range, but then her academic performance was lower than what her intellectual functioning was.  So that was where there was a discrepancy, leading to the learning disability.

Q.   Okay.  But as she sits here today, you're not able to say what her academic equivalency would be in age?

A.   No.

Q.   Okay.  And then when she was 14 years of age she had a full-scale IQ of 61.  Is that correct?

A.   That's correct.

41

Q.    Okay.  And so in seven years her full-scale IQ dropped pretty significantly, correct?

A.    Yes, and a caveat on that.

Q.    Okay.  So it was from 85 down to 61.  So what's the caveat?

A.    So the caveat is you -- so we're looking at full-scale IQ, which is an average of the components of the testing.  And these versions of the Wechsler tests had two indices:  a performance and a verbal indices.  And then based off of those combined, you would get the full-scale IQ.

        However -- and there was consistency between those when she first was given the WISC, but then when she was 14 and administer the WISC-III, which was the newer version at that time, there was a discrepancy between her verbal and her performance IQs.  And the discrepancy was significant enough to indicate that the full-scale IQ would not be an accurate representation of her true abilities.  And so one would better be served to look at the independent verbal abilities and performance abilities independently to look at her functioning because there was the discrepancy between those two.

        So in this case, like as -- doing evaluations for kids in the past too, I wouldn't use the full-scale IQ from that 14-year-old administration for any, like, IEP -- individualized educational plans -- or assessment of an assignment of like an intellectual disability.  There's other

42

measures, like a General -- a GAI score or -- I can't remember -- CPI score, which they're in the manuals.  I would have to look at those for that.  But there's different ways of looking at that.

And the individual, who I believe was a school psychologist, who administered this at 14 noted that discrepancy in their report and indicated that that full-scale IQ was not an accurate representation to base findings off of and that they should be looked at independently.

Q.    Okay.  And one of the discrepancies was when she was 7 years old, on the performance IQ she scored 82 and when she was 14 years old she scored a 52.  So it's a 30-point decline, correct?

A.    Yes.  And that is --

Q.    Hold on.  Let me finish my questions.

So the -- that 30-point decline was before she was charged with any crime, correct?

A.    Yes.

Q.    So there's no issue of -- or we don't have any evidence that she was malingering in that second test that occurred when she was 14 years old?

A.    I did not see any indication of that.

Q.    Okay.

A.    There were other factors in play.

Q.    Okay.  What were those other factors?

43

A.    So the fact that Ms. Hildenbrand has a seizure disorder. And the records weren't clear on the exact timing of things, but she had been seizure-free for six years and then seizure activity reemerged in 1992, when she was 14.  And so I don't know if this testing was done pre or post reemergence of seizures.  And I also don't know if it was conducted a week after a seizure or if it was conducted, you know, a month after a seizure.

So I'm not a neurologist, I can't go into the full medical understanding of it, but there is, you know, brain activity disruption during seizures.  So -- and I know that just immediately following coming out of a seizure, if you've ever observed anyone, they're still kind of reorienting themselves and not -- don't seem to be fully cognizant of maybe their surroundings or the situation.  And so I would presume that there could be some potential lag in regards to performance on testing of these measures.

And so, again, if it was me, back then, I would relate it to that.  And if it had been around the time of seizure activity, I would wait a time period of no seizure activity and retest to assess any potential lasting effects of that seizure activity.

So while I don't think that there was any indication that she was feigning or that this is not her true effort at that time, I don't know, based off of the lack of information

44

about the timelines, if that was her actual true ability at that -- it was her ability at the time of the test, but I don't know if it was her general ability at that age.

Q.    Okay.  So there are outside factors that can affect a person's IQ and can result in an IQ drop, correct?

A.    Yes.

Q.    And then when she was 20 years old she had a full-scale IQ of 69?

A.    Yes.

Q.    Okay.  And then the latest one was a full-scale IQ of 51, correct?

A.    That's correct.

Q.    Okay.  So all of these IQ tests at least are consistent in telling us that she does have an intellectual disability?

A.    The initial test when she was 7 did not indicate an intellectual disability.  It was -- there was a discrepancy between the average-to-low-average performance and her academic functioning for the learning disability.  So that initial test indicated a learning disability.  The subsequent ones suggest some intellectual impairment.

Q.    Okay.  And you don't have any reason to call those into question, do you?

A.    No, I do not.

Q.    So you talked about the effect of seizures on an IQ test. What effect does seizure medication have on an IQ test?

45

A.    I'm not a medical doctor, so I can't opine on that.

Q.    Okay.  So you have no information on whether certain medications can cause a decline in IQ?

A.    I could not opine on that.

Q.    Okay.  And as you state in your report, a true diagnosis of a person's intellectual disability is difficult to ascertain, correct?

A.    Yes, it is.

Q.    In this case, did you ever go over the indictment with Ms. Hildenbrand?

A.    I do not recall.  I know I reviewed the test -- the charges as listed on PACER, but I do not recall reviewing the indictment with her.

Q.    Did you test her ability to understand words -- the words "employ," "use," "persuade," "induce, "entice" and "coerce"?

A.    I can't say I did all of those, but I could say at least some of that aspect because that was part of the discussion of the alleged offense charges.

Q.    How about her -- did you test her understanding of the term "affecting interstate and foreign commerce"?

A.    I do not recall if I went over that with her.  I know I've gone over it in cases, but I can't recall if that was specifically in her case.

Q.    And that's not in your report, right?

A.    I do not believe it is, no.

46

Q.    Did you test her understanding of the term "forfeiture"?

A.    I do not think so, no.

Q.    And so all of the things I was just talking about, these are abstract concepts, aren't they?  They're not concrete, correct?

A.    Correct.

Q.    And Ms. Hildenbrand -- there was some mention in the report about her having some employment, although, you know, we didn't know if it was for a day or two days or how long the employment was.  But any of the employment she had was things like replacing lids or vacuuming, correct?

A.    Yes.

      And I want to revise my response to the previous question.

Q.    Okay.

A.    You had asked -- you had asked if they were abstract versus concrete and I said "yes," but I actually don't think they're abstract.  I think they are concrete, but they are more advanced and nuanced.  Like you wouldn't necessarily hear "forfeiture" in normal, everyday conversation.  So someone would need to have exposure to the more complex.  So I would say complex versus abstract on that.

Q.    Okay.  So when I'm thinking about concrete thinking, I'm thinking, you know:  Move this rock from here to there, and abstract thinking, like, you know:  Is this affecting

47

interstate commerce?  Is that not an accurate depiction?

A.    Well, but is this affecting interstate commerce --

MS. TAYLOR:  And I'm going to object to that question.  I'm not frankly sure if Dr. Smith is an expert in the legal term "interstate commerce."

THE COURT:  Well, Mr. Lasnetski, can you kind of explain to me what you're trying to get to?

MR. LASNETSKI:  Yeah, I --

Hold on, hold on.

THE DEFENDANT:  Sorry.

MR. LASNETSKI:  Your Honor, this is all about my client's ability to assist me and her ability to understand the nature of the charges.  And so these are terms listed in the indictment.  So I'm asking the doctor about her ability to understand these complex terms, which is I think what the Court is going to have to understand, as opposed to simplistic terminology that, you know, we've -- she's described during the testing.  So --

THE COURT:  Okay.  So I understand that, and I do believe that that is relevant.  So I'm going to overrule the objection.  But I do think you need to clean up the question-asking a little bit because I do think it was getting a little confusing.

MR. LASNETSKI:  Okay.  All right.

THE COURT:  So try again.

48

BY MR. LASNETSKI:

Q.   Okay.  Can you explain the difference between abstract thinking and concrete thinking?

A.   Right.  So when I think of abstract thinking, I think of -- gosh, no, that's -- again, that's difficult to articulate the difference on that.

     But from the questioning that you were asking about, the way I see that is simplistic wording and uses of terms.  So "moving this paper from this room to that room" is more simplistic versus "transporting the paper," right.  So it's the same concept.  So it's not an abstract concept, just the vocabulary is more complex.

Q.   How about the term "beyond a reasonable doubt," is that an abstract concept or concrete concept?  And what is your opinion on how Ms. Hildenbrand would understand that concept?

A.   I think that is a legal definition that actually can be operationalized in a more concrete manner, as it is done in jury instructions and by explaining what exactly that means by that legal standard.

Q.   Okay.  So in your report you indicated that your test could not identify Ms. Hildenbrand's low performance on the test, whether it was intentional or unintentional, correct?

A.   That's correct.

Q.   And they didn't indicate why she -- why she performed as she did?

A.    The test results of those tests don't say why.  They just say that it is there.

Q.    Okay.  And as your report notes, a diagnosis of malingering does not preclude the presence of an underlying mental disorder, correct?

A.    That's correct.

Q.    Okay.  Were there any tests that you wanted to administer but you couldn't?

A.    No.  I mean, if Ms. Hildenbrand was fully invested and putting forth full effort, it would be nice to see what her true intellectual level of functioning was.  But to create a diagnosis of an intellectual disability you have to have lower-than-average -- like below-average test scores coupled with impairment in adaptive functioning.

And so while there was some indication of impairment in adaptive functioning, particularly based off of the historical records that I had for Ms. Hildenbrand, she also demonstrated abilities and capabilities in adaptive functioning.  So that's why I provided the provisional of a mild intellectual disability.  So --

Q.    Let me stop you there.  It's a simple question:  Were there any tests that you wanted to conduct that you weren't able to for whatever reason?

A.    Not really, no.

Q.    Okay.  Thank you.

During any of the testing did Ms. Hildenbrand ask you to define certain words for her that were in the questions?

A.    Yes.

Q.    And did you define them for her?

A.    I did not, not during the standard administration.  I might have gone back afterwards and defined them.

Q.    Okay.  So when she's taking the test and answering a question, she may not know what one of the words in the question means?

A.    That's correct.

Q.    Okay.  You testified that she knew my name, and then you said "Jeremy."  Did she ever use my last name?

A.    I believe she did on at least one occasion, but she just primarily utilized your first name.

Q.    Do you -- what was the last name she used for me?

A.    It was close to it but not quite.  I can't remember if it -- it wasn't a clear articulation of it, but it was close.

Q.    All right.  And you don't know what the -- what she said?

A.    I can't recall specifically what it was --

Q.    Okay.

A.    -- but it was enough for me to recognize based off of seeing your name that she was referencing you.

Q.    So she was able to get my first name correct but not my last name?

A.    Well, and the last name was close enough that I could be

51

like, "Oh, do you mean this?"  "Yes, that's it."

Q.    Close enough, but you don't know what --

A.    I can't remember specifically what she said no.

MR. LASNETSKI:  I have no further questions.  Thank you.

THE COURT:  All right.  Thank you, Mr. Lasnetski.

Do you have any redirect, Ms. Taylor?

MS. TAYLOR:  Just briefly.

REDIRECT EXAMINATION

BY MS. TAYLOR:

Q.    Dr. Smith, you were asked about some recordings that you listened to and you took into consideration, correct?

A.    Yes.

Q.    Do you form an opinion solely based upon listening to jail calls?

A.    No.

Q.    Why are those phone calls helpful in forming your opinion?

A.    So it's another data source.  And when individuals are conversing with their social network, they might present in a more natural manner of their typical presentation than they do with me during the formalized settings.  And that isn't necessarily saying there isn't any intention to present any specific way with me.  For example, the way I'm testifying in court is not necessarily how I'm going to be hanging out on my couch with friends.  So there's a difference in the settings

and the expected norms, and so it just gives me a broader sense of their functioning overall.

Q.    And in this case, did you make an opinion or form an opinion about Ms. Hildenbrand's competence based purely on her IQ scores?

A.    No, I did not.

Q.    And there was a question about whether "forfeiture" was concrete or not and whether it's different from moving thing to -- from A to B.

Whether somebody understands a legal term like "forfeiture," if they can understand the underlying concept, which is "the government's going to take your stuff," is that sufficient?

A.    Yes.  I would -- they would need to know that that's what "forfeiture" means.

Q.    So they don't need to like just have an organic knowledge of the term "forfeiture"?

A.    No.  I mean, the word "pursuant," I have a lot of people who don't have intellectual impairments, and when we're going over the court order, they're like, "'Pursuant,' what's that?" And so there's some legal terminology that sometimes needs more definition.

Q.    And do you have an understanding of what it means for something to affect interstate and foreign commerce?

A.    I have a basic understanding.  I couldn't say I have the

53

full legal definitive understanding of it.

Q.    If it were to mean something akin to it moved from -- the item moved from one state to another, do you have believe that Ms. Hildenbrand could understand that concept?

A.    Yes.

Q.    And you've previously testified that she, to you, appeared to have the ability to understand concepts that were explained to her, correct?

A.    Yes.

Q.    And you were asked, you know, do the tests tell you if she's malingering or if she's competent, and I think the answer was no.  I mean, you're considering the whole picture, correct?

A.    Yes.

Q.    So there's not one single test that gives you a definitive answer?

A.    That's correct.

Q.    And based upon your expertise and your expert opinion in this particular case and all of the sources that you reviewed and considered, what was your opinion with regard to Ms. Hildenbrand?

A.    That she has some level of intellectual impairment and has limited exposure to the legal system but has the ability to understand when things are explained to her, ask meaningful questions, and get clarification on concepts that she might not know at that time and discuss it in a meaningful manner.  And

she was able to show that she could retain that information over time.

Q.    And did you also diagnose her with malingering?

A.    I did.

Q.    And do you stand by that diagnosis?

A.    Based off of her performance, she meets the criteria for that diagnosis.

MS. TAYLOR:  I have no further redirect.

THE COURT:  All right.  Thank you.

Anything else, Mr. Lasnetski?

MR. LASNETSKI:  No, Your Honor.

THE COURT:  Okay.  Ms. Taylor -- thank you very much, Dr. Smith.  That is all we need from you.

Ms. Taylor, do you have any additional evidence you would like to present today?

MS. TAYLOR:  No, Your Honor.

THE COURT:  Okay.  Mr. Lasnetski, do you have evidence to present?

MR. LASNETSKI:  No, Your Honor.

THE COURT:  Okay.  So with regard to the hearing today and the information that the Court is considering, like I explained to you previously, Ms. Hildenbrand, I'm here to decide whether by the preponderance of the evidence you are presently suffering from a mental disease or defect rendering you mentally unable to understand the nature and consequences

of the proceedings against you and assist in your defense.

And so previously we had a report that was filed by Dr. Wilmoth and we had her testimony.  We had a report that was filed by Dr. Harris and his testimony.  And then we have the report that was filed by Dr. Smith and her testimony.

And so I want to make clear, Mr. Lasnetski, before I announce my findings, you did speak to your client about her ability to testify today; is that correct?

MR. LASNETSKI:  I have spoken to her about her ability to testify, yes.

THE COURT:  Okay.  And she's decided that she does not want to testify today, correct?

MR. LASNETSKI:  Correct.

THE COURT:  Okay.  Thank you.

All right, then.  After hearing all of the evidence and considering the testimony by the experts in this case, I do find that the defendant is competent to proceed.  I find that she is, based on the testimony, not suffering from a mental disease or defect that would render her incompetent to -- and that she can understand the nature and circumstances of the proceedings against her and to assist properly in her defense.

So based on that ruling, I don't think there is anything else we need to discuss with regard to Ms. Hildenbrand here today, correct, Ms. Taylor?

MS. TAYLOR:  That's correct, Your Honor.

THE COURT:  And Mr. Lasnetski, anything with respect to Ms. Hildenbrand?

MR. LASNETSKI:  No, Your Honor.

THE COURT:  Okay.  I know we do have an issue -- and I see Mr. Hildenbrand's lawyer in the courtroom today.  We have an issue with regard to a motion to suppress that is currently pending, and there was a deadline that was tied to the Court's finding regarding Ms. Hildenbrand's competency.

And so Ms. Taylor, what is the -- I know I did enter an order, I think it was 30 days after the finding of competency?

MS. TAYLOR:  It was 14 days I believe.

THE COURT:  14.

MS. TAYLOR:  And so given the holiday, and then I'm going to be out of town, if I could just have until December 15th to respond?

THE COURT:  That's going to be up -- obviously I need to hear from Mr. Hildenbrand's lawyer.

MR. KORODY:  No objection, Your Honor.

THE COURT:  Okay.  So Ms. Taylor, you have until December 15th to file your response to the pending motion to suppress in the companion case regarding Mr. Hildenbrand.

Then once the Court receives that, your response, I will look at the motions and determine whether we need to have a suppression hearing.  And the Court will issue an order

57

scheduling that hearing once I've had the time to review those documents.

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Okay.  Okay.  So is there anything else that we need to discuss, Ms. Taylor?

MS. TAYLOR:  No, Your Honor.

THE COURT:  All right.  Mr. Lasnetski?

MR. LASNETSKI:  No, Your Honor.

THE COURT:  All right.  Then we'll be in recess. Thank you.

COURT SECURITY OFFICER:  All rise.

(The proceedings concluded at 12:30 p.m.)

-    -    -

58

CERTIFICATE OF OFFICIAL COURT REPORTER


UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA )


    I hereby certify that the foregoing transcript is a true
and correct computer-aided transcription of my stenotype notes
taken at the time and place indicated herein.


    DATED this 8th day of December, 2025.


                /s/ Katharine M. Healey
                Katharine M. Healey, RPR, RMR, CRR, FPR-C
                Official Court Reporter