**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:24-cr-187-WWB-LLL |
| | ) | |
| FREDERICK KARL HILDENBRAND, | ) | |
| | ) | |
| Defendant. | ) | |

# DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE

Defendant Frederick Karl Hildenbrand, by and through the undersigned counsel, respectfully submits this memorandum and requests that the Court impose a sentence of 180 months' imprisonment on each count, all to run concurrently, followed by a lifetime term of supervised release with the conditions the Court deems appropriate. Counsel recognizes the requested sentence is the statutory mandatory minimum. But, for a 55-year-old man with medical issues, it is also, in all likelihood, a life sentence. Mr. Hildenbrand prays that he be given the opportunity to hope that he may be released from behind walls and fences one day. A sentence of 180 months is sufficient, but not greater than necessary, to accomplish the purposes of 18 U.S.C. § 3553(a).[1]

[1] Mr. Hildenbrand maintains his innocence and has objected to the offense-conduct paragraphs of the PSR. Nothing in this memorandum is intended as, or should be construed as, an admission. Because the Court must sentence on the jury's verdict, counsel addresses the § 3553(a) factors in that light.

The advisory Guidelines produce a total offense level of 43 and a recommendation of life, which § 5G1.2 converts into a stacked aggregate of 3,720 months, or 310 years. That enormous number reflects a calculation that does not take into account the history and characteristics of Mr. Hildenbrand, among other factors. Mr. Hildenbrand is a man who as a boy was sexually abused by his own mother, in the bed they shared, until he was twelve years old; who then came of age under a stepfather who beat him and beat his disabled mother; who was diagnosed with clinical depression as an adolescent and never meaningfully treated; and whose adult life was marked by isolation, deprivation, years of homelessness, and, in custody, refusing food and his own heart medication. His life bears every mark of untreated trauma incurred as a child.

This information is not offered as an excuse or defense, yet it clearly explains the offenses of conviction and the way he views the world. It is offered because § 3553(a)(1) requires the Court to sentence the whole person, and because this history speaks directly to Mr. Hildenbrand's moral culpability, to his need for treatment, and to what is actually required to protect the public. A fifteen-year sentence, imposed on a man of his age and health, followed by lifetime supervision, satisfies the purposes of sentencing.

## I. THE GOVERNING FRAMEWORK

The Guidelines are "the starting point and the initial benchmark," but they "are not the only consideration." *Gall v. United States*, 552 U.S. 38, 49 (2007). The sentencing court "may not presume that the Guidelines range is reasonable" and must instead "make an individualized assessment based on the facts presented." *Id.* at 50. The "overarching" instruction of § 3553(a) is that the Court impose a sentence "sufficient, but not greater than necessary," to serve the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

In making that assessment, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person" that the Court may consider. 18 U.S.C. § 3661. The Supreme Court has emphasized that "the fullest information possible concerning the defendant's life and characteristics" is "highly relevant — if not essential — to the selection of an appropriate sentence." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (internal quotation and citations omitted). Mr. Hildenbrand's childhood abuse, his untreated mental illness, his age, and his physical condition are all squarely within that inquiry.

## II. MR. HILDENBRAND'S HISTORY: A CHILDHOOD OF SEXUAL, PHYSICAL, AND EMOTIONAL ABUSE

### A. Sexual abuse by his mother.

Mr. Hildenbrand's father died of a heart ailment when Mr. Hildenbrand was an infant. (PSR ¶ 137.) He was raised as the only child of his mother, Kornelia. Until he was twelve years old, he slept in the same bed as his mother, and, during those years, his mother sexually abused him. His mother performed sexual acts on him, and he was made to perform sexual acts on her. The abuse ended only when his mother married P.D. and P.D. moved into the home. (PSR ¶ 139)[2]

This was not the only sexual abuse he suffered. At eight and nine years old, he was also sexually abused by older children in his neighborhood. Id.

Two features of Mr. Hildenbrand's disclosure are telling. First, he described the abuse by the neighborhood children as "typical back then," or words to that effect. Second, when he authorized counsel to disclose his mother's abuse to the Court, he told counsel that he "failed to see how this was relevant," or words to that effect. A 55-year-old man who still regards the sexual

---

[2]Mr. Hildenbrand initially declined to answer Probation's question about sexual abuse. He later disclosed this history to counsel and authorized its disclosure to the Court, which counsel provided through the defense's written comments to the initial PSR. Delayed and reluctant disclosure is common among survivors of childhood sexual abuse, particularly male survivors and particularly where the abuser was a parent. See Ramona Alaggia et al., *Facilitators and Barriers to Child Sexual Abuse (CSA) Disclosures: A Research Update (2000–2016)*, 20 Trauma, Violence, & Abuse 260 (2019).

abuse of an eight-year-old as unremarkable, and who cannot see why his mother's sexual abuse of him might matter, is not a man who has processed what was done to him. He is a man who has never been helped to recognize it as abuse at all.

**B. Physical abuse, domestic violence, and emotional neglect.**

The end of his mother's sexual abuse did not bring safety. It brought P.D. From the time Mr. Hildenbrand was twelve, his stepfather physically abused both him and his mother, and the home was defined by what the PSR describes as significant domestic violence. (PSR ¶ 138.) Mr. Hildenbrand's mother was herself chronically ill and disabled — she required dialysis for some nineteen years and was an amputee — and Mr. Hildenbrand watched his stepfather abuse her. (PSR ¶¶ 137-38.) His mother, for her part, physically disciplined him and failed to provide the basic emotional attention and care a child requires. Mr. Hildenbrand has had no contact with his stepfather since leaving that home.

School offered no refuge. He struggled academically, was chronically truant, with the courts involved, fell behind, and ultimately left high school after the eleventh grade, later earning a GED. (PSR ¶¶ 148-49.) His own reporting attributed those failures to "problems at home."

**C. Loss, illness, and deprivation.**

Layered over the abuse was grinding poverty. After his father's death, the household lived on Social Security survivor benefits from his father's death. The family sold eggs from their chickens at church to make ends meet, and as a child Mr. Hildenbrand went "dumpster diving" behind local grocery stores for food on a weekly basis. (PSR ¶ 138.) His mother's long illness meant that much of his childhood and early adulthood was spent in an unkept home watching his only parent receive dialysis, amputation, and decline. She died at home in April 2004. Mr. Hildenbrand was her only surviving child.

**D. The Adverse Childhood Experiences framework.**

The Adverse Childhood Experiences ("ACE") framework, developed in the landmark CDC–Kaiser Permanente study, provides a validated way to understand the cumulative effect of this history. The study established a strong, graded relationship between the number of categories of childhood abuse, neglect, and household dysfunction a person experiences and a range of adverse outcomes across the lifespan, including depression and other serious mental and behavioral health conditions. See Vincent J. Felitti et al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults*, 14 Am. J. Preventive Med. 245 (1998). A score of four or more marks a person as

having experienced high adversity; the effects are cumulative and dose-dependent.

Mr. Hildenbrand's record documents at least six of the ten ACE factors: (1) sexual abuse, by his mother and by neighborhood children; (2) physical abuse, by his stepfather and his mother; (3) emotional abuse; (4) emotional neglect; (5) witnessing violence against his mother; and (6) the loss of a parent. His childhood food insecurity arguably supplies a seventh, physical neglect.[3] To put this in perspective, only approximately 17% of the U.S. population has 4 or more ACE factors. See Swedo EA, Aslam MV, Dahlberg LL, et al., *Prevalence of Adverse Childhood Experiences Among U.S. Adults — Behavioral Risk Factor Surveillance System*, 2011–2020. MMWR Morb Mortal Wkly Rep 2023;72:707–715.

Research applying the ACE framework to criminal offenders has found that offenders report adverse childhood experiences at markedly higher rates than the general population. See James A. Reavis et al., *Adverse Childhood Experiences and Adult Criminality: How Long Must We Live Before We Possess Our Own Lives?*, 17 Permanente J. 44 (2013). And a meta-analysis of the research on sexual offending has found that a history of childhood sexual abuse is

[3]The standard ten-item ACE questionnaire, which builds on the categories measured in the original study, covers physical abuse, emotional abuse, sexual abuse, physical neglect, emotional neglect, witnessing violence against one's mother, household substance abuse, household mental illness, parental separation or loss, and incarceration of a household member.

substantially more prevalent among adult sex offenders than among other offenders. Id. (Summarizing that, "[i]n addition, convicted sexual offenders and child abusers were more likely to report experiencing sexual abuse in childhood than other offender types.").

**E. This history bears directly on culpability.**

The Supreme Court has long recognized that a background of abuse and deprivation is relevant to a defendant's moral culpability. Society has long held the belief "that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). Severe childhood neglect and abuse, including sexual abuse, is "the kind of troubled history [the Court has] declared relevant to assessing a defendant's moral culpability." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (citations omitted).

Those principles, especially as applied to Mr. Hildenbrand, are founded in common sense. A defendant whose earliest understanding of touch, intimacy, and the boundaries between parent and child was formed by a mother who sexually abused him stands differently, for purposes of just punishment, than

one who was raised in an environment of safety and stability. The Court may, and respectfully should, strongly weigh that difference.

## III. MR. HILDENBRAND'S CONDUCT DEMONSTRATES SIGNIFICANT, UNTREATED MENTAL ILLNESS

The consequences of Mr. Hildenbrand's childhood did not stay in childhood. The record of his adolescence, his adult life, and his conduct since his arrest makes clear that he suffers from significant mental health problems that have never been adequately treated.

### A. Clinical depression since adolescence, never meaningfully treated.

Mr. Hildenbrand was diagnosed with clinical depression in early adolescence — during the same years in which his mother's abuse ended and his stepfather's began. He was prescribed Prozac and Trazodone and received brief individual therapy. He stopped the medication because it gave him migraines. (PSR ¶ 146.) So far as the record reflects, he has received no mental health treatment of any kind in the four decades since. He describes his depression as severe and as a constant of his life; he told Probation and this Court that he has had "only three years of happiness" in his entire life.

### B. An adult life marked by isolation and collapse.

Mr. Hildenbrand's adult life followed the trajectory the ACE research predicts. He held a series of jobs — including seven and a half years as a

computer technician at Akron Hospital — and earned an associate's degree from the University of Akron in 2004. (PSR ¶¶ 149-51.) But after his mother's death that same year, his life steadily narrowed. He has not worked since approximately 2008. (PSR ¶ 151.) He became increasingly isolated and increasingly convinced that courts and public institutions conspired against him.[4] For roughly six and a half years, he and his family were homeless, living in the woods, in tents, in a travel trailer, and in rented rooms in shared homes. That is not the life of a man who is well. It is the life of a man whose untreated depression and trauma progressively overwhelmed his capacity to function.

**C. His conduct in custody.**

Since his arrest, Mr. Hildenbrand's mental state has visibly deteriorated. He has reportedly engaged in a hunger strike. He weighed approximately 250 pounds when he was arrested (in his arrest video at trial, he appeared overweight); he now weighs approximately 170 pounds. Although he suffers from heart disease and hypertension, he has, by his own choice, stopped taking his prescribed cardiac and blood-pressure medications since his conviction. (PSR

---

[4] Mr. Hildenbrand was successful in an appeal to the Court of Appeals, Stark County Ohio, Fifth Appellate District, Ohio related to the award of custody of a child. The appellate court found that the trial court violated Mr. Hildenbrand's due process rights by granting custody of the child to members of his wife's family without taking any evidence or giving him a right to be heard. *In the Matter of: J.L.H., J.A.H., and F.K.H,* Stark County App. Case No. 2010CA00266, October 17, 2011.

¶ 145.) He told Probation that he expects to die of a heart attack within five years. Counsel has raised his safety and medical care with the detention facility. He has been attacked and had teeth knocked out.

A man with a failing heart who refuses food and refuses the medication keeping his heart functioning is communicating something about his mental state that no evaluation is needed to understand. These are the actions of a profoundly depressed and ill person. They confirm what his history already shows: Mr. Hildenbrand's mental illness is real, it is serious, and it remains unaddressed.

**D. The offense of conviction.**

Mr. Hildenbrand denies the offense conduct, and he has preserved that position. But his offense conduct is not the conduct of a psychologically healthy person. It is, however, consistent with what the research on intergenerational abuse describes: a man whose own earliest boundaries were erased by the parent charged with protecting him, and who never received treatment for what was done to him. Under § 3553(a), the Court must assess Mr. Hildenbrand's moral culpability, the nature of the risk he presents, and what is actually required to address that risk. On each of those questions, the history set out above is highly probative.

### E. The Bureau of Prisons offers the treatment he needs, which can be accomplished in 15 years.

Section 3553(a)(2)(D) directs the Court to consider the need for the sentence "to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner." Mr. Hildenbrand plainly needs treatment — for the depression that has gone unaddressed for four decades, for childhood sexual abuse he has never once confronted, and, given the jury's verdict, for sexual-offense risk. The Bureau of Prisons operates exactly the programs Mr. Hildenbrand needs. Whether Mr. Hildenbrand ever receives them, however, depends on the length of his sentence.

**Sex offender treatment.** The Bureau offers two national sex offender treatment programs under Program Statement 5324.10, CN-1, *Sex Offender Programs*. See also Fed. Bureau of Prisons, *Legal Resource Guide to the Bureau of Federal Prisons 2025*. The Non-Residential Sex Offender Treatment Program ("SOTP-NR") is a moderate-intensity program for offenders assessed as low-to-moderate risk, consisting of cognitive-behavioral psychotherapy groups totaling four to six hours per week over nine to twelve months. Fed. Bureau of Prisons, *Directory of National Programs* 19 (Sept. 13, 2017) (hereinafter "*BOP Directory*"). Mr. Hildenbrand will likely before referred to the Residential Sex Offender Treatment Program ("SOTP-R"), a high-intensity program of ten to twelve hours of weekly treatment, delivered over twelve to eighteen months in a residential

therapeutic community. Id. at 20. The Bureau currently offers the residential program at USP Marion and at FMC Devens. *Legal Guide* at 31. Both programs are voluntary, and the Bureau screens each volunteer with a risk-assessment instrument to place him in the appropriate level of treatment. Id.

These programs target inmates with Mr. Hildenbrand's history. Both target the dynamic risk factors that empirical research associates with sexual re-offense: sexual self-regulation deficits, criminal thinking patterns, intimacy skills deficits, and emotional self-regulation deficits. *BOP Directory* at 18-19. And both are designed to conform to the characteristics of treatment programs with demonstrated effectiveness in reducing re-offense. Id. A man whose earliest model of intimacy was his mother's sexual abuse, and whose adult life has been marked by isolation, untreated depression, and an inability even to name what was done to him, presents precisely the deficits these programs exist to address.

**Trauma treatment.** The Bureau's Resolve Program is a cognitive-behavioral program designed to address trauma-related mental health needs. *BOP Director* at 16. It uses a standardized protocol — a psycho-educational workshop, the Seeking Safety skills group, and intensive treatment through Cognitive Processing Therapy and Dialectical Behavior Therapy — the same evidence-based interventions used by the Department of Veterans Affairs. Id. Resolve is intended for inmates with a mental health diagnosis resulting from

trauma, and participants ordinarily enter during their first twelve months of incarceration. Mr. Hildenbrand has never been diagnosed with or treated for a trauma-related disorder. A comprehensive psychological evaluation upon designation, with referral to Resolve if he qualifies, would address the root cause of his mental health conditions at the earliest point in his sentence.

**Timing.** The sex offender treatment programs are not available on entry. Inmates are ordinarily placed in either program during the last thirty-six months of their sentences, prioritized by release date. Under a 180-month sentence, Mr. Hildenbrand would become eligible for sex offender treatment in his early sixties, complete it before release, and carry that treatment directly into lifetime supervision with community-based treatment conditions. Under a sentence of decades — let alone one measured in centuries — his treatment would be scheduled against a release date that a 55-year-old man will not live to reach. He would, in practical terms, never be treated at all for sexual deviancy. A sentence that forecloses the very treatment § 3553(a)(2)(D) contemplates cannot provide that treatment "in the most effective manner."

## IV. MR. HILDENBRAND'S AGE AND PHYSICAL CONDITION MAKE A FIFTEEN-YEAR SENTENCE A LIFE-ENDING ONE

Mr. Hildenbrand is 55 years old. He was diagnosed with heart failure in 2022, following a hospitalization in Titusville, Florida, and suffers from a heart

condition and high blood pressure. (PSR ¶ 145.) He also suffers from chronic, progressively worsening lower back pain and knee problems. Heart disease runs in his family: his father died of cardiac disease when Mr. Hildenbrand was an infant. (PSR ¶ 137.) And, as discussed above, he has stopped taking his cardiac medication and lost some eighty pounds in custody.

Mr. Hildenbrand has been detained since August 2024. Even assuming he earns every day of available good-conduct time, a 180-month sentence would not release him until approximately 2037, when he will be about 66 years old. A sentence of fifteen years is therefore not a moderate sentence for this defendant. It is, realistically, a sentence that will consume what remains of his life.

The purposes of protecting the public and affording deterrence, § 3553(a)(2)(B)–(C), are fully served by such a sentence. Mr. Hildenbrand, even with the minimum sentence permitted under the law, upon release, will be old and sick, and he will then remain under lifetime supervision, sex-offender registration, and stringent conditions restricting his contact with minors and his access to the internet. (PSR ¶ 175.)

Incarcerating an aging and ill prisoner also carries real costs. The Department of Justice's Inspector General has found that aging inmates are more costly to incarcerate than younger inmates, largely because of their medical needs, and that the Bureau of Prisons faces significant challenges in providing

them appropriate care. See U.S. Dep't of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Revised February 2016); see also PSR ¶ 167 (annual cost of incarceration). Every year of imprisonment beyond the mandatory minimum would be purchased at that cost, and would buy no meaningful additional protection for the public that supervised release could not provide.

## V. A SENTENCE OF 180 MONTHS IS SUFFICIENT BUT NOT GREATER THAN NECESSARY

Taken together, the § 3553(a) factors point to the statutory minimum. Fifteen years in federal prison is severe punishment by any measure, and it reflects the seriousness of the offenses of conviction. § 3553(a)(2)(A). It accounts for a history of childhood sexual, physical, and emotional abuse and decades of untreated mental illness, as § 3553(a) requires.

## VI. FINES AND FINANCIAL ASSESSMENTS

Mr. Hildenbrand is indigent. He respectfully requests that the Court waive any fine based on his inability to pay, and that it decline to impose, or impose only nominal, discretionary assessments under 18 U.S.C. § 2259A, which require the Court to consider his ability to pay. As to restitution, Mr. Hildenbrand rests on his written objections, including that any amount above the $3,000 statutory minimum for the possession counts requires the government to

prove his relative role in the causal process under *Paroline v. United States*, 572 U.S. 434 (2014), and 18 U.S.C. § 2259(b)(2).

**CONCLUSION**

Mr. Hildenbrand respectfully asks the Court to sentence the person before it: a 55-year-old man in heart failure, with no prior record of consequence, who was sexually abused by his mother throughout his early childhood, beaten by his stepfather through his adolescence, and left with a depression that has gone untreated for forty years and that now manifests in his refusal to eat or to take the medication that keeps him alive. A sentence of 180 months' imprisonment on each count, all concurrent, followed by lifetime supervised release with mental health and sex offender treatment is sufficient but not greater than necessary to serve the purposes of 18 U.S.C. § 3553(a). Mr. Hildenbrand respectfully requests that the Court impose that sentence.

Respectfully submitted,

/s/ Patrick K. Korody
Patrick K. Korody
Florida Bar No. 0107361
Korody Law, P.A.
630 West Adams Street, Suite 208
Jacksonville, Florida 32204
Telephone: (904) 383-7261
patrick@korodylaw.com
Counsel for Defendant

## Artificial Intelligence Certification

To the extent that generative AI was used in any drafting of this filing, any language drafted by AI—even if later edited by a human—was personally reviewed by the filer or another human for accuracy and all legal citations reference actual, non-fictitious cases or cited authority and accurately reflect the contents of such authority.

/s/ Patrick K. Korody
Patrick K. Korody
Florida Bar No. 0107361
Korody Law, P.A.
630 West Adams Street, Suite 208
Jacksonville, Florida 32204
Telephone: (904) 383-7261
patrick@korodylaw.com